James NEWBERRY and Connie Newberry and
Pulaski Mortgage Company *v.* George S. SCRUGGS and
Ann Scruggs; Larry Baker and Earlene Baker

98-1375                                                986 S.W.2d 853

Supreme Court of Arkansas
Opinion delivered March 11, 1999

*Marian M. McMullan, P.A.*, for appellants.

*Stockland & Trantham, P.A.*, by: *Charles S. Trantham*, for appellees.

R AY THORNTON, Justice.  George and Ann Scruggs acquired title to a tract of land by a warranty deed recorded on January 11, 1994.  The financing for the purchase of this land was secured by a first mortgage in the amount of $70,000 in favor of Worthen Bank.  On September 2, 1994, and October 14, 1994, the Washington County Circuit Clerk entered judgments against George Scruggs in favor of Larry and Earlene Baker in the amounts of $73,025.00 and $10,505.50.  These judgments

were inferior to the Worthen mortgage. On November 18, 1994, James and Connie Newberry made an offer to buy the tract of land from the Scruggses. The Newberrys sought financing for their purchase from Pulaski Mortgage Company (PMC). Before PMC would issue a mortgage to the Newberrys, it required them to obtain title insurance. PMC and the Newberrys hired Bronson Abstract Company to conduct a title search, issue title insurance, and act as an escrow agent for the parties. Bronson conducted two searches prior to having American Title Company issue a title insurance policy, and failed to locate the Bakers's judgment lien on the Scruggses' property. At the time of closing, the Scruggses' existing first mortgage was held by Worthen Bank. Bronson, acting as an escrow agent, paid off this mortgage in the amount of $71,647.06 with funds the Newberrys obtained from PMC to finance their purchase of the real property from the Scruggses. The sale was closed on December 15, 1994.

The Bakers obtained a writ of execution on their judgment lien on February 17, 1995. In this writ, the sheriff was ordered to take possession of the property the Newberrys had purchased from the Scruggses to satisfy the $85,000 judgment owed to the Bakers. The real property described in the writ was the property the Newberrys had purchased from the Scruggses. After Bronson had paid the Scruggses' mortgage to Worthen, the Bakers contend that their judgment lien moved from one of junior priority to the Worthen mortgage to one of senior priority over the PMC mortgage.

The Newberrys petitioned the circuit court to stay, quash, or set aside the writ of execution. The Newberrys also petitioned the circuit court to transfer the case to chancery court to address the issue of equitable subrogation. The circuit court ordered the transfer of the equitable issues to chancery court and reserved ruling on the petition to stay, quash or set aside the writ.

The chancellor found that neither PMC nor the Newberrys were entitled to equitable subrogation because their agent, Bronson, had acted with "inexcusable negligence," which was imputed to PMC and the Newberrys, when it failed to discover the judgment lien on the Scruggses' property during the two title searches

prior to paying off the mortgage owed to Worthen. The chancellor then returned the case to circuit court to decide the remaining issues.

The Newberrys and PMC appealed the chancellor's decision to the Arkansas Court of Appeals. Holding that the parties appealed from an order that was not final, the court of appeals dismissed the case. The case was then returned to the circuit court. The circuit court refused to stay, quash, or set aside the writ and ordered a sheriff's sale.

On appeal, appellants contest the rulings made by the chancery court. We reverse and remand.

■ Because this appeal is from a final order entered by the circuit court on the basis of a decision by the chancery court, we first address the decision of the chancery court. The standards governing our review of a chancery court decision are well established. We review chancery cases *de novo* on the record, and we do not reverse unless we determine that the chancery court's findings of fact were clearly erroneous. *Aycock Pontiac v. Aycock*, 335 Ark. 456, 983 S.W.2d 915 (1998).

For appellants' first point on appeal, they argue that the chancellor erred when he found that Bronson Abstract Company was an agent acting on behalf of appellants. Based on the finding of an agency relationship between Bronson and appellants, the chancellor imputed Bronson's negligence to appellants and therefore denied appellants' request for equitable subrogation.

■ Whether Bronson was appellants' agent can be determined by looking at the general principles of agency law. In *Taylor v. Gill*, 326 Ark. 1040, 934 S.W.2d 919 (1996), we explained the law in this area:

> The burden of proving an agency relationship lies with the party asserting its existence. *B.J. McAdams, Inc. v. Best Refrigerated Express, Inc.*, 265 Ark. 519, 579 S.W.2d 608 (1979). This court has used different definitions of agency that were appropriate for the particular cases, but each of them includes the element of control by the principal. In *Evans v. White*, 284 Ark. 376, 682 S.W.2d 733 (1985) and *Campbell v. [Bastian]*, 236 Ark. 205, 365 S.W.2d, we adopted the definition of agency contained in the

> Restatement (Second) of Agency. We said the two essential elements of an agency relationship are (1) that an agent have the authority to act for the principal and (2) that the agent act on the principal's behalf and be subject to the principal's control. In *Hinson v. Culberson-Stowers Chevrolet, Inc.*, 244 Ark. 853, 427 S.W.2d 539 (1968), we examined the Restatement definition together with a quote from 2 AM. JUR. 13, *Agency* § 2 and concluded that the essential elements for a showing of the agency relationship were authorization and control.

*Taylor v. Gill*, 326 Ark. 1040, 934 S.W.2d 919 (1996) (citations omitted).

Applying this very well-developed body of law to the present case, it is clear that an agency relationship did not exist between Bronson and appellants. Appellants hired Bronson to perform two services. First, Bronson was to obtain and provide appellants with title insurance on the Scruggses' property. Second, Bronson was to act as an escrow agent in the real estate transaction between the Newberrys, PMC, the Scruggses, and Worthen.

The tasks performed by Bronson were not subject to the control of appellants. Bronson performed a title search as an agent of American Title Company prior to the insurance company issuing a title insurance policy to appellants. The search was performed free of dictates or restraints from appellants. It was undertaken to allow American Title Company to determine the risk and liabilities against which they were insuring. Thus, any acts of negligence in the title search by Bronson should not have been imputed to appellants because no agency relationship was present.

Similarly, the acts performed by Bronson as an escrow agent for the parties do not fit within the traditional parameters of an agency relationship. Once again, appellants hired Bronson to perform a service; specifically, to act as an escrow agent. Bronson, as an escrow agent, held the money designated by PMC to pay off the Scruggses' Worthen mortgage until the closing date and then released these funds to pay off the mortgage. These actions were not subject to appellants' control or authority. Bronson, instead, was acting as a neutral third party. Thus, because there was no agency relationship between appellants and Bronson, the chancel-

lor erred when he imputed Bronson's negligent acts onto appellants.

We note with favor the analysis used by the Texas court when it was asked to address the issue of whether a title insurance company is acting as an agent of the home buyer when it is conducting a title search. In *Tamburine v. Center Savings Association*, 583 S.W.2d 942 (Tex. Ct. App. 1979), the Texas court held that "where the insurance company commits itself to issue a policy upon certain conditions, the unilateral conduct of the insurance company or its agents in investigating the title does not create an agency relationship." *Id.* In that case, a declaratory judgment was sought to determine that the plaintiffs were vested with equitable title to certain land. The plaintiffs argued that they should have been awarded superior title to the land in dispute because the defendants had hired a title company to perform a title search and issue title insurance. The plaintiffs contended that the title company should have found the plaintiffs' claim to the land during their title search and if they found such a claim the defendants, as principals of the agency relationship between the defendants and the title company, were "on notice" of the plaintiffs' claim to the land. Thus, the defendants could not be bona fide purchasers of the property. The court, in rejecting this argument, examined the various tasks performed by a title company and determined that:

> as we understand the title insurance business, the company, before issuing a policy of title insurance, must necessarily take steps to inform itself of the status of the title to be found. In the search for information upon which must depend the decision to either issue or decline to commit itself to issue a policy, the insurance company obviously investigates the title for its own use and benefit to determine whether it will undertake the risk. The title information on which the company bases its decision relates to the condition of the title held by the grantor and is not made for the prospective grantee or lien holder to whom the policy will finally issue.

*Tamburine v. Center Savings Association*, 583 S.W.2d 942 (Tex. Ct. App. 1979).

Therefore, because appellants lacked the requisite control or authority over the actions of Bronson during the title

search and activities as an escrow agent, the chancellor should not have found an agency relationship existed.[1] Accordingly, the chancellor's finding that Bronson's negligence should be imputed to appellants was clearly erroneous.

For appellants' second point on appeal, they contend that the chancellor erred by not applying the theory of equitable subrogation to their situation. We outlined the concept of equitable subrogation in *Southern Cotton Oil Company v. Napoleon Hill Cotton Company*, 108 Ark. 555, 158 S.W. 1082 (1913). In that case, the Southern Cotton Oil Company paid off two mortgages owed by J.U. Martin. Southern Cotton Oil Company paid off these obligations with the understanding that it would be the senior lien holder of certain property owned by Martin. However, Martin could not give Southern Cotton Oil Company this position as a senior lien holder because the property was subject to a judgment lien in favor of Napoleon Hill Cotton Company. In applying the doctrine of equitable subrogation to these facts, we set forth the principles of this theory:

> The doctrine of subrogation is an equitable one, having for its basis the doing of complete and perfect justice between the parties without regard to form, and its purpose and object is the prevention of injustice. Subrogation in its literal and equitable significance, is the demanding of something under the right of another to which right the claimant is entitled for the purpose of justice to be substituted in place of the original holder. It is the machinery by which the equity of one man is worked through the legal rights of another. It rests upon the maxim that no one shall be enriched by another's loss, and may be invoked whenever justice and good conscience demand its application in opposition to the technical rules of law, which liberate securities with the

---

[1] Having held that Bronson was not acting as appellants' agent, we will decline to determine whether Bronson was instead acting as an independent contractor. However, we do note that generally an employer may be held liable for the conduct of a careless, reckless, or incompetent independent contractor when the employer was negligent in hiring the contractor. *Arkansas Pools Inc. v. Beavers*, 281 Ark. 109, 661 S.W.2d 395 (1983). Thus, if appellants had negligently hired Bronson to act as an independent contractor they might have been liable if the selection of Bronson was itself a negligent act by appellants. Here there is no showing that engaging the services of Bronson was negligent in and of itself.

extinguishment of the original debt. This equity arises when one not primarily bound to pay a debt, or remove an incumbrance, nevertheless does so; either from his legal obligation, as in the case of a surety, or to protect his own secondary right; or upon the request of the original debtor, and upon the faith that, as against the debtor, the person paying will have the same sureties for reimbursement as the creditor had for payment. Like the vendor's lien for purchase money, it is the creation of a court of equity from the circumstances. The doctrine is also justly extended, by analogy, to one who, having no previous interest, and being under no obligation, pays off the mortgage, or advances money for its payment, at the instance of a debtor party for his own benefit; such a person is in no true sense a mere stranger and volunteer.

*Southern Cotton Oil Company v. Napoleon Hill Cotton Company*, 108 Ark. 555, 158 S.W. 1082 (1913).

■ Applying the principles announced in *Southern Cotton*, we held that:

One who advances money to pay off an incumbrance on realty, at the instance either of the owner of the property or the holder of the incumbrance, either on the express understanding or under circumstances from which an understanding will be implied, that the advance made is to be secured by a first lien on the property, is not a mere volunteer; and, in the event the new security is, for any reason, not a first lien on the property, the holder of such security, if not chargeable with culpable and inexcusable neglect, will be subrogated to the rights of the prior incumbrancer under the security held by him, and to this end equity will set aside a cancellation of such security, and revive the same for his benefit.

*Stephenson v. Grant*, 168 Ark. 927, 271 S.W. 974 (1925); *See also, Baker, Adm'r v. Leigh*, 238 Ark. 918, 385 S.W.2d 790 (1965); *Cooper v. Home Owners' Loan Corp.*, 197 Ark. 839, 126 S.W.2d 112 (1939).

■ The chancellor erred by not applying the principle of equitable subrogation to this case. The circumstances of the case fit within the classic framework of equitable subrogation. Appellants, who were under no legal obligation, paid off the Scruggses' mortgage to Worthen to protect their interest. When PMC paid

the Scruggses' obligation, they understood that they would take the senior security interest in the home the Newberrys were purchasing. However, appellants were not able to obtain this position because the property had a prior judgment lien on it that would, except for the principle of equitable subrogation, have advanced to the senior position after the Worthen mortgage was paid. Because appellants were innocent parties in this transaction, it would be inequitable to sell the home to satisfy the Scruggses' debt. The chancellor should have allowed appellants to use the principles of equitable subrogation to preserve the first mortgage position held by Worthen prior to the satisfaction of that obligation.

For appellants' final point on appeal, they argue that the chancellor erred when he determined that Bronson had committed culpable negligence. Culpable negligence is the omission of something that a reasonable, prudent, and honest person would do, or the doing of something that such a person would not do, under all circumstances surrounding each particular case. *Home Fed. Sav. & Loan Ass'n v. Citizens Bank*, 43 Ark. App. 99, 861 S.W.2d 321 (1993). We find no error in the chancellor's finding that Bronson did commit culpable negligence in this case. It is in the business of performing title searches and to have missed the judgment lien on the property not only once, but twice, is something that a reasonable, prudent, and honest person would not do. Accordingly, the chancellor's finding on this point was not clearly erroneous.

Because we have determined that the principle of equitable subrogation is applicable to the circumstances of this case, we reverse and remand to the circuit court for further proceedings consistent with this decision.

Reversed and remanded.